Good morning, Your Honor. May it please the Court. My name is Amir Abdullah. I am appearing for the petition on this matter. Your Honor, the petitioner on this matter is a citizen and national of Mexico who has been in the United States for over 25 years. She is married to a U.S. citizen and has two U.S. citizen children, ages 19 and 14. Her U.S. citizen spouse filed a petition to adjust her status, which is still pending. In 1990, pursuant to the Zamperano case, she filed an application for legalization. And during the pendency of the application, she took advance parole and went on several occasions in a brief and casual trip to Mexico. Then in 1994, she got news that her aunt, who raised her, had a heart attack. She rushed to the local office to obtain advance parole. However, the officer in the office told her, you really don't need an advance parole. You can travel on your work authorization card, the I-688. She took his advice and left. Then upon return, she was detained and placed in exclusion proceedings. She filed a motion to reopen with the immigration judge, stating that to place her in exclusion proceedings is improper because her trip to Mexico was only for seven days, short, brief, and casual. And under the doctrine of truity, she should be allowed to have the case terminated because it's not an entry, and placed in deportation instead so that she can apply for adjustment of status or suspension of deportation or cancellation of removal. Nevertheless, even though acknowledging the fact that her departure was brief, casual, and innocent and she did not have any meaningful interruption of her application, denied her motion and ordered her deported without even designating the place where she was to be deported. Now, according to the ruling of this circuit and the Fourth Circuit, to place an alien returning back who is a legalization applicant in exclusion proceedings would be improper and cannot be condoned. Basically, to place the alien in exclusion proceedings, he would lose a lot of rights to apply for certain forms of relief, like this case. This petitioner has a lot to lose. She's been here for a long time. She has a U.S. citizen spouse, two U.S. citizen children ages 19 and 14, and to separate the family because the judge who has the inherent power to close the case and allow the service to reopen again so she can apply in deportation proceedings for this kind of relief is really an abuse of discretion and not consistent with the committee in Congress which directed the Attorney General to treat the legalization applicant with sympathy and generous fashion. I filed a motion with the Board of Immigration Appeals while this petition for review is still pending, telling them to reopen the case, asking to reopen the case to apply for adjustment of status. It was denied because the judge has no jurisdiction in exclusion proceedings to accommodate the petitioner and looking at the petitioner in this case, she is really trapped in exclusion proceedings. She has no rights and if she were to be deported, she would be separated from her family and that deserves the sympathy of this Court. Thank you, Your Honor. Roberts. Thank you. We'll let you reserve your time. Mr. Cunningham. Thank you again, Your Honor. John Cunningham from the Justice Department appearing on behalf of the Attorney General. May it please the Court. In preparing for this case, it did seem to me that perhaps the issue that I ought to talk about from the beginning is the application of the Court's decision in Espinoza-Gutierrez because that decision holds that legalization applicants need not comply with the regulations that require obtaining advanced parole. The default position is the brief, casual, and innocent doctrine. Could you speak a little louder? I'm sorry. The default position is the brief, casual, and innocent doctrine in Rosenberg v. Flutie. I think that the immigration judge sort of walked up to the edge of that decision but then didn't decide it. He didn't look like he paid any attention to it. Well, I think he acknowledged it, Your Honor, but then didn't decide it. And the question, of course, is can the Court decide it here and now? And I think you can because it simply is a question of construing the reach of the Court's own precedence. And this is the interesting heart of this case because in our brief we attempted to provide the Court with a road map through the complicated journey of the Zombrano litigation. This much is clear that by the time the immigration judge ruled in the summer of 1999, the Zombrano litigation had been concluded the previous year. And the outcome of that litigation was that the only bona fide applicants for legalization under the Immigration Reform and Control Act were those who filed during the original statutory time limit. Ms. Pineda-Vihar did not file within that time limit. She was a late filer under the Class II of the Zombrano litigation. She filed at some point in 1989. So what we have then is as a result of the chronology of Zombrano and the chronology of Ms. Pineda-Vihar's case, by the time the immigration judge ruled, Ms. Pineda-Vihar was no longer a bona fide legalization applicant. So my suggestion to you is that given that fact, Espinoza-Gutierrez does not apply. I don't want to go so far as to say that that decision no longer means anything. I think it does, but it only applies to persons who fell within the original statutory deadline imposed by the IRCA for filing legalization applications. So the default position, as I said before, is Rosenberg v. Flutie, which holds that someone who is here in the U.S. is not held to have departed or have made an entry upon returning if the visit overseas was brief, casual, and innocent. We point out in our brief that the petitioner's brief before this court does not really come to grips with that issue. There may be a waiver of it. But I suggest to you that the analysis should focus on the word innocent, and then you have to examine the evidence of record regarding whether Ms. Pineda-Vihar knew when she left the U.S. for Mexico in 1994, that she was obliged to get advance parole. I'm not sure that's where we look for innocence. It was an innocent trip. She was going because her aunt was ill. Yes. And she stayed away just for a week. Yes. So that's perfectly innocent, isn't it? It meets part of the innocent trip, part of the innocent criteria, Your Honor. I certainly was brief and was casual in the sense that she wasn't going overseas, for example, to make money or to because she decided to live somewhere else for a couple of years. In that sense, it was clearly casual. So we know it was brief and we know the purpose was innocent. Right. And so the question is whether innocence also depends on whether you know when you leave the U.S. what your requirements are to come back in. And I think that innocence should include that criterion. You're not ignorant of the law's requirements. If you are, then I think then you are innocent. But if you're not, then you're not innocent. Well, she tells us that an immigration officer of some sort told her that her card would be enough. Yes. I'm going to tell you a little story. I had a clerk a few years ago who carried a Bahamian and an Australian passport. She had a father who was Australian and a mother who was Bahamian. She and I and all my clerks went up to Canada to our summer place where I always have a retreat for my clerks. On the return trip from Canada, the immigration officer said that she must come in because she had her visa, which was a work visa for working for me as a clerk. She went in with all her papers. And when she came back out, she was just delighted. She said, you know, I was going to have to go through the rigmarole of getting my visa renewed for next year. And he said he would stamp it and extend it for 60 days so I can go on my trip to Vietnam and come back and then take care of it. And I said, well, that's just great. So she goes to Vietnam. She comes back within the period that this visa had been extended. The immigration officer at the Seattle airport said that officer had no basis, no right to extend that visa. They finally paroled her into the United States after holding her for 24 hours. And she had extreme difficulties getting all of that straightened out. So you and I both know that immigration officers are sometimes ignorant. They sometimes give bad advice. So why can't we rely on the fact that this woman has to die? And he said, oh, that's OK. You've got your work permit. I think that it that would we have a slightly different set of facts here, Your Honor. I think you could do that if this was the very first time that Ms. Penaeita Gajar went over the border. But there was evidence in the record that she had gone back and forth across the border several times before that. And there was evidence in the record that she had obtained advance parole in 1991, that she knew what the process was. Yes, but the rules keep changing. Well, I think that the rules were probably true the same all along, Your Honor. We might get mistaken interpretations by those rules by INS officers. But the other piece of evidence that you should pay attention to is her interview with the INS in January of 1994, when she was apprehended at the border. And this is at page 165 and 166 of the record. She was asked, did you seek to obtain permission from the INS before you left for Mexico? And she said, no, it was an emergency. I didn't do it. I didn't think I had to do it, and so I didn't do it. Apparently, she developed a belief on her own that because this was an emergency visit, and I do not dispute that it was, she didn't have to seek to obtain advance parole. Now, my colleague said this morning, if I heard him right, that she did try to get advance parole. She went to the INS office and asked for it, and she was told affirmatively, no, you don't need that. That's new to me. That claim has not been made before that she actually asked for advance parole. It's not borne out by her contemporaneous declaration in January of 1994. She simply seemed to say that I didn't think I had to get advance parole this time because this was an emergency. That's just not the law. Well, that may not be the law, but it's certainly an innocent explanation if we're looking for innocence. Yes. And as I said before, if this was the very first time that Ms. Pineda-Bajar had been in the system, if this was the very first time she had sought to come in and out between Mexico and the U.S., I might be more in agreement with Your Honor's analysis on this, but since she had been in the system before, since she had obtained advance parole before, she can't be characterized as innocent. During the hearing, Ms. Pineda-Bajar was asked specifically, did you ever seek to get advance parole from the INS at any time since you first came to the U.S. back in 1982? She said no. She was shown the document where it indicated that she had been granted advance parole, and she denied that she – she said, I don't remember applying for that. There's a stamp on the lower right-hand corner of the document that said that she actually used it. She used it to come back into the U.S. in May of 1991. She first denied that she had ever done that and then simply said, I don't remember any of that. This was not particularly convincing testimony. It showed – and she apparently realized the problem that she had when it was shown to her that the INS's files showed that she had applied for advance parole previously and had been granted it, that she understood what the process was. Can I ask you, Mr. Henning, I'm looking at that page 165 that you gave us a reference to. Yes, Your Honor. And she says – the question is, did you ask permission? Answer, no, it was an emergency, and I didn't know. If I had known, I would have asked. Yes, Your Honor. Don't we have to take that – I mean, the truth of that is not disputed. So she says, I didn't know. It isn't as though she willfully did something that she knew was wrong. Two points in response to that, Your Honor. First, there is, of course, the basic principle that people are held to know the requirements of the law. Innocence, ignorance is not a legal term. Well, that's quite a strong proposition to advance. If ignorance makes you guilty, there are not going to be many people qualifying for the innocent. Well, I revert to my discussion with Judge Fletcher. Again, if this was the very first time she had ever sought to go back in and out of the U.S. and Mexico, we might have a different situation. It wasn't. Why don't you have to take the people as they are? She says, and it seems to have plausibility, I just didn't know. Well, the second point, Your Honor, is that this interview shows absolutely no claim on her part that she was told by an INS officer that her work authorization would be enough to get her back in. Well, that's true. That's true. And that's the significance of this interview from my perspective, that this claim did not arise until several years later. Well, I think you're perfectly right on that. But it's also true that people, after they get a lawyer and they see what claims they can make, they develop defenses. And it doesn't mean the defense is untrue. It just means without a lawyer, they never thought of it. That's correct, Your Honor. I mean, it's simply a question of what evidence you put the most weight on. I think in this case, the immigration judge was within his bounds in deciding that that interview in January of 1991 had more weight. Did he actually find that she was lying or what? No.  But he did. That analysis was part of his conclusion that she was not innocent in the legal sense because she knew what advance parole requirements were, having applied for it earlier. How long does it take to get advance parole permission? I don't know, Your Honor. It probably depends on what the level of business is at a particular INS office on a particular day. I don't know the answer to that. But here she is a sick aunt. She goes immediately, and then she comes back a week later. Yes. I understand that. My time is up. Anything else? No, Your Honor. Okay. I thank the Court for its attention. Thank you very much. I bid you good morning. Yes. You had a few minutes for rebuttal. I would like to call the attention of the Court to my excerpt of record on page 28. Despite notwithstanding the fact that the respondent has previously applied for advance parole, this time when she had the emergency and was told that she doesn't need one, consistent with all the other cases of legalization applicants like CSS and SO workers, later on in 1999, when she now understands that it is necessary for her to obtain advance parole, she took an advance parole, indeed, and she left for a few days and came back again. That tells us that this person is innocent because when she's told she needs one, she got one. But when she was told by the officer she doesn't need one, she followed his advice innocently and left and came back. In addition to that, isn't that the inherent jurisdiction of the immigration judge and the board, to admin close the case and allow aliens to apply for cancellation of removal? They do that all the time. I receive the on their own motion. I receive orders from the board. Admin closing the case so the service can file another case, allow the alien to apply for cancellation of removal because they have children here, and the children are grown up, 19 years old, for God's sakes, a U.S. citizen, 14 years old, a husband who's a U.S. citizen. I mean, for technicality like that, it is unfair to send her back and leave the family and leave all these 25 years she's been here in this country. I believe the court would realize the dilemma that she is placed in. Thank you, Your Honor. Thank you. The matter will be submitted. The next case on the calendar is Perez.
judges: B. Fletcher, Noonan, Paez